IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOSEPHINE LOGUIDICE and EMILIE NORMAN**,<br><br>Plaintiffs,<br><br>**v.**<br><br>**GERBER LIFE INSURANCE COMPANY**,<br><br>Defendant. | **No. 7:20-cv-3254** |

**<u>SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>**

1. This Complaint concerns one of America's most recognizable and trusted brands—Gerber. But this Complaint does not concern the Gerber Products Company's iconic baby food, whose quality Plaintiffs have no reason to doubt. Rather, this complaint concerns the Gerber Life Insurance Company's consumer insurance products, which, although they share the trusted logo of the wholesome smiling baby, are the financial equivalent of junk food.

2. This proposed class action seeks monetary damages, restitution, and injunctive and declaratory relief from Defendant Gerber Life Insurance Company ("Defendant" or "Gerber Life"), arising from its deceptive naming and marketing of its so-called "Grow-Up Plan and "College Plan." Gerber promotes these plans as an affordable way for a parent or grandparent to build a nest egg for a beloved child or grandchild. However, these supposed savings plans actually lock consumers into a guaranteed loss at best and total loss of their investment at worst.

3. Gerber Life misrepresents the nature of both plans by the products' very names. The so-called "College Plan" is not a college savings plan at all. It has no specific attributes designed to tailor it to the needs of college savers and is quantifiably a worse college savings vehicle than other common college savings devices. The "Grow-Up Plan" has zero value—and indeed produces a loss—if a child actually "grows up." Indeed, the product only arguably has any net value if the covered child dies. For obvious reasons, Gerber Life did not name this product the more accurate "Never Grow-Up Plan."

4. Instead, Gerber Life misrepresents the nature of both products by issuing marketing materials that fail to correct reasonable understandings of the products' names, and that affirmatively misrepresent and/or omit key facts regarding the actual functioning and features of the products. By doing so, Gerber Life has convinced hundreds of thousands of well-meaning but unsophisticated parents and grandparents to pour their often meager savings into risky plans that provide little if any value, putting all their eggs into the wrong basket.

5. Plaintiffs seek, among other remedies, injunctive relief that requires Gerber Life to correct these misrepresentations so that consumers can determine whether these products truly are suitable savings vehicles.

**THE PARTIES, JURISDICTION AND VENUE**

6. Plaintiff, Josephine Loguidice is a citizen of the State of Florida and purchased "Grow Up" policies with Gerber Life Insurance Company.

7. Plaintiff Emilie Norman is a citizen of New York and purchased both a "Grow-Up" policy and a "College Plan" policy with Gerber Life Insurance Company.

8. Defendant, Gerber Life Insurance Company, is incorporated and maintains its principal business offices in White Plains, New York.

9. This Court has jurisdiction of this action under 28 U.S.C. § 1332(d)(2)(A) because this is a class action and the amount in controversy exceeds the $5,000,000, exclusive of interest and costs, and a member of the class is a citizen of a state different from the citizenship of Defendant.

10. Venue in this district is appropriate because Defendant resides in this district.

## COMMON FACTUAL ALLEGATIONS

### I. THE GERBER GROW-UP PLAN IS DECEPTIVELY NAMED AND MARKETED

11. Gerber Products Company, owned by parent company Nestlé, is well-known for its baby food, accounting for over 80% of total sales in the U.S. The food brand is synonymous with a safe and healthy child. In 1967, Gerber Products Company began selling insurance products as Gerber Life Insurance Company. In September 2018, Nestlé sold Gerber Life Insurance Company to Western & Southern Financial Group for $1.55 billion. Gerber Products Company licenses its trademark to Gerber Life Insurance Company, which offers a handful of financial products prominently featuring the iconic baby face logo.

12. One of those products is the "Gerber Life Grow-Up Plan," which it aggressively markets to cover young children. The plan is popular. By Gerber Life's own account, as of 2011 Gerber Life claimed to have "received more than 500,000 Grow-Up applications 'in the last year alone.'"[1]

13. Consumers like Plaintiffs Loguidice and Norman sign up for monthly deductions from their checking accounts from less than $5 to more than $100, in order to provide a "head start" for their children or grandchildren of savings, a "cash value," or a "nest egg" that they can have when they turn 18.

14. While Gerber Life markets it as a savings product, the Gerber Grow-Up Plan is not a savings plan; it is actually a life insurance policy. It provides no meaningful savings benefits—and actually, when accounting for inflation, operates at a loss for consumers.

15. The Gerber Life Grow-Up Plan is whole life insurance plan. The major benefits touted by Gerber Life in uniform and incessant marketing are two-fold, and they are both false.

16. First, Gerber Life claims that the product helps "protect" the child as he/she grows up, when in fact the protection is for parents or grandparents of dead children. Second, Gerber Life claims that the Grow-Up Plan is a good savings

[1] Chuck Jaffe, *Grow-up insurance for kids makes little sense*, MARKET WATCH (Mar. 4, 2011) https://www.marketwatch.com/story/grow-up-insurance-is-stupid-investment-of-the-week-2011-03-04

vehicle to provide children and grandchildren with a "nest egg" and "cash value" they can use when they "Grow-Up." The Grow-Up Plan is, in fact, a terrible savings plan.

17. Based on Gerber Life's marketing, parents and grandparent imagine their kids using their plans for a first car, their first home, or any other major expense they might need. They jump at the chance to cheaply save for their child's future. But it is false to tout the product as a savings vehicle. After twenty years of their parent or grandparent paying the premiums, a child may get $ 700. Even before accounting for taxes and inflation, that is a net loss, not a gain. Indeed, Gerber Life's guaranteed "cash values" or "nest eggs" would lock people into a loss for nearly 20 years.

18. Gerber Life never discloses this information in its marketing.

### A. The Gerber Grow-Up Plan Is Not a Nest Egg and Offers no Meaningful Savings Benefits

19. For a consumer, it currently costs $7.22 a month to insure a 3-year-old child with a $10,000 Grow-Up Plan.

20. Despite extensive marketing regarding the cash value and nest egg provided by the Grow-Up Plan, Gerber Life never discloses what the actual value of these are in its marketing materials. That is because the truth is staggering.

21. In the example above, the Grow-Up Plan would provide zero "cash value" until the fourth year of premiums. The amount of the "nest egg" at that

point would be $27 —after the consumer has paid $259.92 in premiums. That is a massive net loss.

22. Assuming all premiums were paid, by the time the child turned 18, the "nest egg" would have grown to $705.60. By that point, the parent or the grandparent would have paid $1,299.60. Again, a massive loss.

23. AboveBoard Financial found that not only is the cash value less than premiums paid early on, it remains so *for almost 40 years*.



[2]

Gerber Life's refusal to provide these honest numbers during marketing and sign-up for the Grow-Up Plan is an intentional effort to ensure consumers do not learn the truth: the Grow-Up Plan is a terrible savings vehicle. Indeed, it is not a savings

[2] Wallis Wilkinson Tsai, *5 Charts Gerber Life Insurance Doesn't Want You to See*, ABOVEBOARD FINANCIAL, https://www.aboveboardfinancial.com/blog/5-charts-gerber-life-insurance-doesnt-want-you-to-see (last accessed July 31, 2020).

vehicle at all.

24. Gerber Life not only omits these key facts, it also misrepresents the savings potential of the Grow-Up Plan. It deceives consumers with testimonials that say "you stick pennies in a change jar, put 'em in a policy!"[3]—even though the return (zero) on the change jar would be far superior to the negative return provided by the Grow-Up Plan, not to mention the risk of losing all value if a premium payment is missed. Gerber Life misleads consumers when it urges them to "Give your child a head start." This is not a financial head-start for a growing child; at most, it is a benefit to a grieving parent or grandparent when that child dies.

25. Parents and grandparents pay dearly for entrusting their scarce savings funds to Gerber Life. While the Grow-Up Plan also provides a benefit to those same parents or grandparents if their children die, that benefit is not one that reasonable consumers seek out or are willing to pay for as a stand-alone product.

26. Reasonable consumers like Plaintiffs are not willing to pay for stand-alone children's death insurance, and they certainly are not willing to pay for such insurance at the extreme cost of locking in guaranteed savings losses on funds they could otherwise invest for a positive return.

---

[3] *Give Your Child a Head Start with the Gerber Life Grow-Up® Plan*, GERBER LIFE INSURANCE COMPANY (June 1, 2016), https://www.youtube.com/watch?v=g4tPJrUQGxY.

### B. The Gerber Grow-Up Plan is Children's Death Insurance, Which Reasonable Consumers Do Not Seek Out

27. As Gerber Life knows, consumers have little to no interest in buying insurance to protect themselves in the event of their child's death.

28. Juvenile life insurance is so unnecessary that even the insurance industry itself does not believe in it.

> "The case for it is not very strong," admits Steven Weisbart, a senior vice president and chief economist at the Insurance Information Institute, an industry trade group.
>
> So why does this product exist at all? Well, it's helpful to think of children's life insurance as something of a vestigial organ. According to sociologist Viviana Zelizer, juvenile insurance was introduced by the Prudential Life Insurance Company in 1875, emerging at a time when society was transitioning from viewing children as an economic contributor to the family to seeing them as a source of emotional sustenance worth spending money on.
>
> Children's life insurance appealed to poverty-stricken moms and dads who might not otherwise be able to afford the elaborate Victorian customs surrounding death. Millions of people signed up for it. "It was not the hope of ready cash but the desire for a proper mourning ritual that prompted poor parents to invest their meager funds in premiums," Zelizer writes.
>
> …
>
> But as the children's mortality rate fell over the course of the 20th century, the insurance companies' pitches changed. By the 1930s, companies barely mentioned death. Instead, they talked about children's life insurance as a way of investing in their future, a line that continues to this day, even as better options—like 529s—are now available.[4]

---

[4] Helaine Olen, *The Yuckiness of Gerber Life Insurance*, SLATE (Jan. 26, 2016) https://slate.com/business/2016/01/gerbers-life-insurance-for-kids-is-a-rip-off-yuck.html.

29. Instead, Gerber Life now markets children's life insurance as a way of investing in their future. That is fundamentally misleading.

30. This is precisely the reason that Gerber Life promotes its children's death insurance as a "savings" plan or as a means to provide a "nest egg"—because consumers like Plaintiffs have no desire for children's death insurance. They are seeking to protect their children and grandchildren, not pocket money if those children and grandchildren die.

**C. Gerber Life Misrepresents Benefits of, and Omits and Conceals Material Facts About, the Gerber Grow-Up Plan**

31. In light of the true nature of the product, described above, Gerber Life's uniform marketing materials—including the very name of the product—for the Grow-Up Plan are revealed to be rife with misrepresentations.

32. The major benefits touted by Gerber Life in uniform and incessant marketing are two-fold, and they are both false: first, that the product helps "protect" the child as he/she grows up and "secure his future", when in fact the protection is for parents or grandparents of dead children. Second, Gerber promises that the Grow-Up Plan is a good savings vehicle to provide children and grandchildren with a nest egg and cash value they can use when they "Grow-Up."

33. Gerber Life consistently and ceaselessly touts the nest egg provided by the Gerber Grow-Up Plan in its marketing because it knows that reasonable consumers have little or no interest in children's death insurance, as in the

advertisement below:

Resolve to protect your little one with the Grow-Up® Plan View Online




Coverage Doubles Builds Cash Value






An extra boost for your resolutions

**The Gerber Life Grow-Up® Plan** automatically builds cash value each time you make a payment, building a nest egg for your child's future. The longer you own the policy, the more cash value the policy accumulates.

Learn More





The Gerber Life Grow-Up® Plan is a children's whole life insurance policy.

Gerber Life – Continuing the long Gerber tradition by helping parents care for their children since 1967.

You may receive free Milestone Stickers without applying for insurance by writing to us: Gerber Life Insurance Company, 445 State Street, Fremont, MI 49412. The retail value of this item is in accord with your state's requirements.

Please add info@family.gerberlife.com to your address book to ensure email delivery.

If you no longer wish to receive email from Gerber Life Insurance Company, click here.

Policy Form ICC12-GPP
Policy Form Series GPP-12

Copyright © 2019
Gerber Life Insurance Company
1311 Mamaroneck Avenue
White Plains, NY 10605
Call toll-free 1-877-843-1280

EM-GU58










[5]

[5] *It's not too late for a New Year's Resolution*, GERBER LIFE INSURANCE COMPANY (Jan. 2, 2019), https://milled.com/gerber-life-insurance/its-not-too-late-for-

34. In its advertisements, Gerber Life states that the so-called nest egg "grows and grows."

a-new-years-resolution-6DeyJQJHWarH-BuQ.



[6]

35. The Gerber Life website's explanation of "cash value" adds to the

---

[6] *Show your love. Apply for the Grow-Up® Plan*, GERBER LIFE INSURANCE COMPANY (Feb. 7, 2019) https://milled.com/gerber-life-insurance/show-your-love-apply-for-the-grow-up-plan-O2Nh5ptFoo-X6DN7

misrepresentation that the policy provides a meaningful way to save:

## So what exactly is cash value?

It's a feature of whole life insurance. The cash value of your policy is the accumulated amount of money that Gerber Life sets aside each time you pay your premium. That means that the longer you hold your policy, the longer the cash value builds. Best of all, the cash value of your policy as well as the policy never expires.

**How can cash value be used?**

1. **You can borrow against the cash value of your policy.** Let's say that your car breaks down, or your child needs some extra cash for college costs, or maybe you're between jobs and need some extra cash flow. No matter the financial emergency, you can borrow money against your policy's cash value. It's a lot like taking out a loan, but it's more like borrowing from yourself rather than from another financial institution. However, the loan amount will reduce the policy's coverage amount until the loan is paid back. (Policy loan interest is 8%.)
2. **If you ever decide to turn in your policy, you would receive the accumulated cash value** that has been building over time, less any outstanding debt against the policy. [7]

36. As discussed above, though, the returns provided by the Grow-up Plan are *de minimis* and unlikely to be enough to cover a car repair or any significant amount of college costs—and in any event much worse than the returns if devoted parents and grandparents had simply placed the funds in a piggy bank.

37. Gerber Life produces legions of marketing videos for the Grow-Up Plan. One video shows two doting dads watching their babies in a hospital room. After one dad starts fretting about kindergarten and college, the other dad reassures him that "Gerber Life can help give your baby a good financial start… it's easy and costs just pennies a day."[8] Another video focuses on the dedication of mothers.

---

[7] *How Cash Value Works*, GERBER LIFE INSURANCE COMPANY, https://www.gerberlife.com/understanding-life-insurance/life-insurance-101/how-cash-value-works (last accessed July 31, 2020).

[8] *Discover How the Gerber Life Grow-Up® Plan Builds Cash Value*, GERBER LIFE INSURANCE COMPANY (Nov. 12, 2015) https://www.youtube.com/watch?v=75Wf9owrkzk.

Over animation that resembles children's drawings, a voiceover of a cherubic child's voice explains all the ways her mommy takes care of her, like putting her in warm clothes and helping her ride her bike. Then, the pitch: "My mommy loves me. She wants to help protect me. That's why she got me the Gerber Life Grow-Up Plan. It protects me now, and it'll protect me when I'm big."[9]

38. If a consumer shows interest in the Gerber Grow-Up Plan on the website and provides Gerber Life with his or her email address, Gerber Life then pummels the consumer with endless email marketing, which include subject lines and marketing that conveys two consistent, uniform messages to parents and grandparents. First, Gerber Life claims that the Grow-up Plan allows a parent or grandparent to do right by their children: protect them, look out for them financially, take care of them, etc. In other words, that the primary benefit of the product is to benefit the child. That is false; the product only provides a meaningful benefit if the child dies, not if the child "grows up." Second, Gerber Life claims that the product provides a savings-based, rational way to provide a nest egg for their child. That is also false.

39. Below is just one example of the constant stream of emails Gerber Life sends to consumers:

[9] *Gerber Life Grow-Up® Plan: How a Mother Protects Her Child*, GERBER LIFE INSURANCE COMPANY (May 28, 2015), https://www.youtube.com/watch?v=-yFp3Fw525A.


[10]

40. Each of these repeatedly, heartstring-tugging marketing messages

[10] *Ensure a lifetime of protection for your child*, GERBER LIFE INSURANCE COMPANY (Sep. 4, 2019), https://milled.com/gerber-life-insurance/ensure-a-lifetime-of-protection-for-your-child-1h-sAx5JUlv0z-Ey

misrepresent that the Grow-Up Plan is a benefit to the child (as opposed to the parents or grandparents of dead children); and that the Grow-Up Plan provides a smart savings program to give youngsters a head start on a "nest egg" they can use for meaningful expenses.

41. Reasonable consumers like Plaintiffs do not know, and do not understand, what a "whole life" policy is, or how such a policy interacts with the promise to provide a "nest egg" that "grows and grows."

42. The Grow-Up Plan has been criticized by financial advisers for years. In 2016, Helaine Olen, a personal finance journalist, noted that:

> [I]f you live in New York, it will cost $7.22 a month to insure a 3- year-old child. That is, indeed, 23.7 pennies a day, or $86.64 a year. Sounds inexpensive enough, especially for something that offers the promise of being not only life insurance but an investment, too.
>
> But what's the value of that investment? When I called the advertised [Gerber Life] 800 number, I discovered the cash value would begin in the policy's fourth year with—get this—$27. By the time the insured child turned 18, it would have grown to $705.60.
>
> By that point, the policyholder would have paid $1,299.60.
>
> Parents would be better off putting that $86.64 a year in an emergency savings account or, if they're saving for college, turning to a more appropriate instrument like a state-sponsored college 529 account. Heck, parents would be better off sticking the money in a mattress. After 15 years, the cash value of the mattress would be larger than the cash value of the Gerber Life Grow-Up Plan. [11]

[11] Helaine Olen, *The Yuckiness of Gerber Life Insurance*, SLATE (Jan. 26, 2016), https://slate.com/business/2016/01/gerbers-life-insurance-for-kids-is-a-rip-off-yuck.html.

43. In sum, Gerber Life concealed from consumers (a) the guarantee that consumers would *lose money* on the "nest egg" they were supposedly saving for; and that (b) the primary benefit of the product was only in the event of the death of a child. As such, all representations that the program was to protect or benefit the child were false and misleading.

44. Gerber Life's marketing materials never disclosed these risks and material facts, instead luring consumers to sign up for the Gerber Grow-Up Plan with misrepresentations and omissions.

**D. Plaintiffs' Experience**

45. Plaintiff Loguidice signed up for the Grow-Up Plan for all seven of her grandchildren. She believed based on Gerber Life marketing materials that it was a nest egg/college fund that will provide cash value when each child turns 18. She purchased the policies in September of 2018 for her seven grandchildren, A.L., C.L., G.L., L.H., S.R.L., C.H., and S.L. Since then, she has dutifully paid $27.69 in premiums every month, for a total of $553.80. Unlike a typical savings plan, should she miss payments, she risks losing all the premiums she has paid.

46. In purchasing the policies, Ms. Loguidice reasonably and justifiably relied on Gerber Life's advertising messages like those in paragraphs 33, 34, and 39 above. She further relied on other advertising messages from Gerber carrying the same messages that the policies would provide a "nest egg" and "build cash value."

47. Specifically, Ms. Loguidice also relied on printed advertisements mailed

to her, social media advertisements, and the Gerber Life website—all of which made marketing promises that the plans were a smart way to save and create a "nest egg" for her grandchildren's future.

48. Ms. Loguidice had no interest or desire in seeking coverage that would make a payment to her in the event of the death of one of her grandchildren. She wanted to save for, protect, and plan for their lives, not their untimely deaths.

49. In 20 years, Ms. Loguidice will have paid $6,645.60 in premiums. To be sure, if one of the grandchildren dies, the family will receive a payment— $5,000 if the child dies before age 18, and $10,000 if the child dies after age 18— cold comfort for such a loss. Yet should the children live for twenty years, as the vast majority of children do, and then try to actually use the supposed "nest egg," the combined cash value would be only $ 3,804.30— *less than 58% of the value Ms. Loguidice paid, prior even to accounting for inflation.* Had she simply placed that money under a proverbial mattress, her grandchildren would have a "nest egg" nearly $3,000 larger.

50. Ms. Norman purchased a Grow-up policy for her child, M.G. She believed based on Gerber Life marketing materials that it was a nest egg/college fund that would provide cash value when M.G. turns 18. She purchased the policy in March of 2019. Since then, she has dutifully paid premiums of $18.51 per month until she cancelled the policy in June of 2020, for a total of at least $259.14.

51. In purchasing the policies, Ms. Norman reasonably and justifiably

relied on Gerber Life's advertising messages like those in paragraphs 33, 34, and 39 above. She further relied on other advertising messages from Gerber carrying the same messages that the policies would provide a "nest egg" and "build cash value."

52. Specifically, Ms. Norman also relied on printed advertisements mailed to her, social media advertisements, and the Gerber Life website—all of which made marketing promises that the plans were a smart way to save and create a "nest egg" for her child's future.

53. Ms. Norman had no interest or desire in seeking coverage that would make a payment to her in the event of the death of M.G. She wanted to save for, protect, and plan for M.G.'s life, not M.G.'s untimely death.

54. In 20 years, Ms. Norman would have paid at least $ 4,442.40 in premiums. To be sure, if M.G. had died, Ms. Norman would have received a payment— $25,000 if the M.G. died before age 18, and $50,000 if the M.G. died after age 18— cold comfort for such a loss. Yet should M.G. live for twenty years, as the vast majority of children do, and then try to actually use the supposed "nest egg," the cash value would be only $2,926.25 — *less than 65% of the value Ms. Norman would have paid, prior even to accounting for inflation.* Had she simply placed that money under a proverbial mattress, her daughter would have a "nest egg" far larger.

## II. THE GERBER LIFE COLLEGE PLAN IS DECEPTIVELY NAMED AND MARKETED

55. In addition to the Gerber Life Grow-Up Plan, the company also offers the "Gerber Life College Plan," which is aggressively marketed to cover young children.

56. Consumers sign up for monthly deductions from their checking accounts, with the hope and expectation that they are saving for their children's future education.

57. While Gerber Life markets it as a college savings product, the Gerber Life College Plan is *not* a college savings plan but an endowment life insurance policy in disguise.

58. Endowment life insurance pays out on the death of the insured. It also has a guaranteed payout at a set time – in this case 10 or 20 years. The return on premiums that the guaranteed payout represents is tiny relative to the years-long contributions made by consumers. Because of this, the Gerber Life College Plan is a terrible college savings vehicle, and is designed primarily to increase the profits of Gerber Life by taking advantage of consumers who believe they are responsibly putting away money for their children and grandchildren.

### A. The Gerber Life College Plan Is Not a College Savings Vehicle

#### 1. The Gerber Life College Plan Provides No Specific College Savings Benefits

59. The Gerber Life College Plan is not a college savings plan. Indeed, this

life insurance product has no unique characteristics that recommend it as a college savings product.

60. Many financial experts recognize this. According to one expert, Joseph Hurley, founder of SavingforCollege.com:

> I see nothing inherently different about this company's insurance product that gives it special advantages for college purposes. I have never found a compelling reason to prefer insurance as a college investment vehicle because of the extra costs, the early surrender penalties, and — in the case of modified endowment contracts — the income-tax hit. A tax-free vehicle like a 529 or Coverdell [Education Savings Account] has many advantages over insurance."[12]

61. Gerber Life's marketing ceaselessly touts the product as a college savings vehicle, but the product is not designed for that purpose, fails to perform in a way that meets that purpose, and is demonstrably worse than the myriad other products available to consumers that actually are designed to further college savings goals. Gerber Life omits all these facts from its marketing.

62. Therefore, the name of the product, the Gerber Life College Plan, is *per se* deceptive.

**2. The Gerber Life College Plan Has Substantial Undisclosed Downsides Compared to Other Common College Savings Vehicles**

63. As discussed herein, the returns on the supposed college investments in

[12] Chuck Jaffe, *This college savings plan flunks the test*, MARKETWATCH (Mar. 11, 2011), https://www.marketwatch.com/story/this-college-savings-plan-flunks-the-test-2011-03-11.

the College Plan are tiny. But even those tiny returns would overstate the benefit to consumers like Plaintiff. That is because endowment life insurance policies that return capital are taxed as such, whereas other college common college savings plans are not. This key difference between the Gerber Life College Plan and other college savings vehicles is concealed and misrepresented by Gerber Life.

64. Gerber Life touts "growth" over time with charts in its marketing materials and on its website that show the payout at the end of the Plan period.

65. But these charts omit to tell consumers that they will be paying taxes on some of the "growth," significantly reducing any returns over time.

66. 529 savings plans are one of the most common savings plans for those looking to pay for college, and are specifically designed for that purpose. The Gerber Life College Plan, however, is not.

> "Despite the name, the Gerber College Savings Plan doesn't offer state tax-deductible contributions or the ability to withdraw and spend funds on college expenses tax-free, both of which the 529 savings plan offers, and therefore isn't a college plan at all," Alan Moore, founder and certified financial planner at Serenity Financial Consulting, explained to me when I asked for his professional opinion. "This plan is more of a forced savings account, as the actual payouts offer very little gains."
>
> The 529 savings plans Moore mentioned are remarkably flexible, state-sponsored savings accounts with tax benefits. They're generally the default savings option recommended by financial planners, and according to Moore, they're a better option than life insurance.
>
> Plus, the guarantee of the Gerber plan's cash value is contingent upon monthly payment of premiums, like any other insurance plan. In contrast, 529s do not regulate how much or how often you must contribute, beyond large-scale contribution limits, and they never expire. If you open a 529 savings plan and contribute to it once, the account's beneficiary gets that

money for college, no matter what.[13]

67. Moreover, the Gerber Life College Plan has a negative impact on financial aid eligibility. The Gerber Life College Plan is a form of life insurance, which is not reported as an asset on the Free Application for Federal Student Aid (FAFSA). However, the full plan payout amount must be reported as income on the FAFSA, reducing eligibility for need-based financial aid by as much as half of the distribution amount.

68. The Expected Family Contribution ("EFC") is part of the financial aid formula used by the federal government to determine a student's eligibility for financial aid. But a distribution from a Gerber Life College Plan counts against a student at 50%--meaning the Gerber Life College Plan funds will effectively *replace* financial aids funds a student would otherwise have been eligible for. This key difference between the Gerber Life College Plan and other college savings vehicles is concealed and misrepresented by Gerber.

69. There is yet another, key, undisclosed difference between the Gerber Life College Plan and other common college savings plans like 529 plans. Any guarantee of the Gerber Life plan's cash value is contingent upon monthly payment of premiums, like any other insurance policy. If a Gerber Life College Plan participant makes regular contributions, but then misses a payment, she will lose

[13]Libby Kane, *Gerber Sells A College Savings Plan, But You Probably Shouldn't Buy It*, JOURNAL STAR (Jun. 10, 2014), https://www.pjstar.com/article/20140610/NEWS/306109990.

all or a significant portion of her investment.

70. Indeed, if a family cancels the Gerber Life College Plan, the refund value may be *less than* the contributions made by the family, since the plan payout is guaranteed only when the policy reaches maturity, if all plan premiums have been paid.

71. Remarkably, then, other common college savings plans like 529 plans easily outperform Gerber Life College Plans—*even before* accounting for the tax hit, financial aid eligibility harm and missed-payment penalties that are all features of the Gerber Life College Plan. Indeed, a 529 plan currently yields more than double the earnings of the Gerber Life College Plan even before all these disadvantages are taken into account. As of August 2018, even a common Bank certificate of deposit easily outperformed the Gerber Life College Plan:

| | Gerber Life College Plan | Long-term bank CDs | 529 plans |
|---|---|---|---|
| Interest rate | 2.7% | 3.25% | 6.0% |
| Payout on $50.05/month at 17 years | $13,000 | $13,644 | $17,768 |
| Total earnings | $2,790 | $3,434 | $7,558 |
| Total taxes (24% Bracket) | ($670) | ($824) | None |
| Impact on financial aid | ($6,500) | ($102) | None |
| Total net of taxes and financial aid | $5,830 | $12,718 | $17,768 |
| Earnings net of taxes | $2,120 | $2,610 | $7,558 |
| Earnings net of taxes and financial aid | **($4,380)** | **$2,508** | **$7,558** |

[14]

72. Once financial aid and tax implications are accounted for, the Gerber Life College Plan is a losing college investment, and in fact has no characteristics that uniquely recommend it as a college savings vehicle.

### 3. The Gerber Life College Plan is an Aggregated (Bundled) Product whose Disaggregated Pieces Would Each Be Much Cheaper on Their Own

73. The College Plan provides life insurance to covered parents or grandparents. Such life insurance, on its own, is exceedingly inexpensive.

74. Parents and grandparents could simply buy a term life insurance policy for significantly less per month versus Gerber Life College Plan installment and place the rest of the money in a 529 college savings plan with a reasonable

[14] Mark Kantrowitz, *Is the Gerber Life College Plan a good investment?*, SAVING FOR COLLEGE (Aug. 30, 2018), https://www.savingforcollege.com/article/is-the-gerber-life-college-plan-a-good-investment.

rate of return. If they did this, they'd have significantly more money to pass on in the event of their untimely death, and the 529 money would return substantially more over any period of time measured against Gerber Life's plan.

75. As a specific example, a term life policy will cost $20 per month or less for *$100,000* in coverage for healthy adults. (Indeed, Gerber Life itself offers life insurance coverage at or below this rate). In the context of the College Plan, though, Gerber Life charges $150.00 per month for just $25,000 in life insurance coverage, plus the college savings "payout" at the end of the term of the College Plan. This means consumers are paying approximately $125.00 more per month for the supposed "college savings" benefits of the plan, while getting significantly less life insurance. As discussed herein, the miniscule payout at the end of the term is likely a net loss for college funding purposes.

76. Gerber Life fails to tell parents and grandparents that were they to purchase life insurance separately, then use the remaining funds to invest in other common college savings vehicles (such as a 529 plan), those parents and grandparents would benefit their children with *significantly more* saved college funds. In short, Gerber Life misrepresents and conceals the fact that the aggregation of two products—a life insurance product and a college savings product—means that purchasers of the Gerber Life College Plan are getting worse deals on *both*.

77. A simple example reveals just how ill-suited the Gerber Life College

Plan is to save for college. According to the Gerber Life College Plan website, a 28-year old father of a 7-year old child would pay $169.42 per month for 11 years to provide his child with a $25,000 college savings benefit when the child turns 18, plus life insurance coverage if the parent were to die before then. The total premiums paid over 11 years would amount to $22,363.44. That means the pre-tax "return" would be only $2,636.56—and that amount doesn't even account for taxes, the financial aid hit discussed above. When those costs and risks are accounted for, the parent will have far less in college savings than if he had simply put $169 per month under a mattress.

78. Again, financial advisers have recognized for years that the Gerber Life College Plan is a bad investment.

79. Insurance consultant David Bohannon of Louisville, Ky. noted that a 28-year-old parent in good health could get a $100,000 10-year term life insurance policy for $136 per year. So take the $184.82 Gerber monthly premium, subtract $11.50 — a month's payment on the term policy — and there's $173.32 per month left over to put in a 529 plan. At an average annualized return of 4% per year for 11 years, that will grow into $28,700 over 11 years, delivering more insurance in the event of a catastrophe and more money even if the worst never happens.[15]

[15]Chuck Jaffe, *This college savings plan flunks the test*, MARKETWATCH (Mar. 11, 2011), https://www.marketwatch.com/story/this-college-savings-plan-flunks-the-test-2011-03-11.

### B. Gerber Life Misrepresents Benefits of, and Omits and Conceals Material Facts About, the Gerber Life College Plan

80. In light of the true nature of the product, described above, Gerber Life's uniform marketing materials—including the very name of the product—for the College Plan are revealed to be rife with misrepresentations.

81. According to the Plan website: "The Gerber Life College Plan provides a safe, secure and easy way to help pay for college, with both guaranteed growth and the additional benefit of adult life insurance."[16]

82. As discussed above, the College Plan provides no unique benefits for college savings, and in fact harms consumers with unique liabilities that other common college savings vehicles do not have. Further, the claim of "guaranteed growth" is false in the context of college savings. It is more likely that the College Plan will result in a net loss for consumers.

83. Gerber Life similarly states: "When your policy reaches maturity, you'll receive your full benefit payment — which is guaranteed to be greater than all the premiums you paid." "There is no investment or interest rate risk!"

84. That is similarly misleading in the context of college savings.

85. The College Plan website has a benefits calculator that provides

---

[16] *Gerber Life College Plan*, GERBER LIFE INSURANCE COMPANY, https://www.gerberlife.com/saving-for-college/college-plan (last accessed June 23, 2020).

payment and end of plan benefits. Deceptively, all of these illustrations on the Gerber Life website assume the consumers will pay the taxes on that return from someplace else. The net return, after taxes, will always be lower than what's shown—and even that does not account for adverse financial aid impacts, which are never warned about.

86. In its marketing, Gerber Life makes misleading and deceptive comparisons to 529 plans. According to the FAQ:

Q. What is the difference between the Gerber Life College Plan and a 529 plan?



A. There are three main differences between the Gerber Life College Plan and a 529 plan.

1. 529 plans must be used for college expenses — or else penalties will be incurred. The Gerber Life College Plan can be used to pay for college expenses or anything else, once the policy reaches maturity.
2. The value of your 529 plan may be impacted by the ups and downs of the economy, which presents an element of risk. The Gerber Life College Plan offers stable growth that isn't impacted by economic fluctuations.
3. The Gerber Life College Plan is the only College Plan that also offers the additional benefit of adult life insurance.

[17]

87. Gerber Life barely mentions one of the most important differences between the Gerber Life College Plan and a 529 plan: that returns from the Gerber Life College Plan are taxable:

[17] *College Plan Questions*, GERBER LIFE INSURANCE COMPANY, https://www.gerberlife.com/saving-for-college/college-plan/questions (last accessed June 23, 2020).

Q. What about taxes?



A. The Gerber Life College Plan will generate some taxable income, Gerber Life Insurance will send you a statement (Form 1099) to file with your taxes.

[18]

88. If a consumer shows interest in the Gerber Life College Plan on the website and provides Gerber Life with his or her email address, Gerber Life then pummels the consumer with endless email marketing, which include subject lines and marketing that conveys a consistent, uniform message to parents and grandparents: if you want to do the right, smart thing for your child and help them pay for college, buy the Gerber Life College Plan. But that is false.

89. Below is just one example from the constant stream of emails Gerber Life sends to consumers:

[18] *College Plan Questions*, GERBER LIFE INSURANCE COMPANY, https://www.gerberlife.com/saving-for-college/college-plan/questions (last accessed June 23, 2020).




19

---

[19] *Plan for college the right way*, GERBER LIFE INSURANCE COMPANY (May 7, 2019), https://milled.com/gerber-life-insurance/plan-for-college-the-right-way-

90. Each of these statements furthers the misrepresentation contained in the very name of the product: that the Gerber Life College Plan is a product with unique advantages that recommend it for the purpose of saving for college. That is false.

91. In sum, Gerber Life concealed from consumers (a) the extreme risk that use of the Gerber Life College Plan would result in a net loss of scarce college savings funds; (b) that the product has unique disadvantages vis a vis other common college savings products; and that (c) the Gerber Life College Plan has no unique benefits that tailor it to performing the unique task of college savings. Gerber Life's marketing materials never disclosed these risks and material facts, instead luring consumers to sign up for the Gerber Life College Plan with misrepresentations and omissions.

**C. Plaintiff Norman's Experience**

92. Plaintiff Norman signed up for the Gerber Life College Plan. She believed based on Gerber Life marketing materials that it was a sensible way to save for M.G.'s college education. She purchased the policy in April of 2019. From then until she cancelled the policy in June of 2020, she dutifully paid $94.95 in premiums every month, for a total of more than $1,300. Yet when she cancelled the policy, she received approximately $200, a massive loss.

---

HkWdomjzs9BnuqTT.

93. In purchasing the policy, Ms. Norman reasonably and justifiably relied on Gerber Life's advertising messages like those in paragraph 89 above. She further relied on other advertising messages from Gerber carrying the same messages that the policies were a sound way to save for college

94. Specifically, Ms. Norman also relied on printed advertisements mailed to her, social media advertisements, and the Gerber Life website—all of which made marketing promises that the plans were a smart way to save for college.

## CLASS ALLEGATIONS

95. Plaintiffs bring this action on behalf of themselves and as a class action on behalf of the following proposed Class:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased a Gerber College Plan or Grow Up Plan (the "Class").

96. Plaintiffs reserves the right to modify or amend the definitions of the Class as this litigation proceeds.

97. Excluded from the Class are Gerber Life, its parents, subsidiaries, affiliates, officers and directors, any entity in which Gerber Life has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

98. This action is properly maintainable as a class action pursuant to Fed.

R. Civ. P. 23(b)(2) and 23(b)(3).

99. The Class consists of thousands of members, such that joinder of all Class members is impracticable.

100. There are questions of law and fact that are common to the Class members that relate to Gerber Life's practice of misrepresenting life insurance plans as savings vehicles.

101. The claims of the Plaintiffs are typical of the claims of the proposed Class because they are based on the same legal theories, and Plaintiffs have no interests that are antagonistic to the interests of the Class members.

102. The Plaintiffs are adequate representatives of the Class and have retained competent legal counsel experienced in class actions and complex litigation.

103. The questions of law and fact common to the Class predominate over any questions affecting only individual Class members, particularly because the focus of the litigation will be on Gerber Life's conduct. The predominant questions of law and fact in this litigation include, but are not limited to:

- Whether Gerber Life's marketing and labeling of the Plans is deceptive;
- Whether Gerber Life misrepresented to Plaintiffs and the Class how the Plans worked and what benefits were provided;
- Whether Plaintiffs and members of the Class were harmed by Defendant's misrepresentations; and

- Whether Plaintiffs and the Class have been damaged, and if so, the proper measure of damages.

104. Other questions of law and fact common to the Class include the proper method or methods by which to measure damages.

105. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the common issues of the Class members to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Gerber Life, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Gerber Life's misconduct will proceed without remedy. In addition, without a class action, it is likely that many members of the Class will remain unaware of Gerber Life's conduct and the claims they may possess.

106. It appears that other persons who fall within the Class definition set forth above are not pursuing similar litigation, such that individual Class members do not wish to control the prosecution of separate actions.

107. This proposed class action does not present any unique management difficulties.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Deceptive Acts or Practices – N.Y. Gen. Bus. Law § 349

### Asserted on Behalf of the Class

108. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

109. N.Y. Gen. Bus. Law § 349(a) provides that "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

110. Gerber Life's actions regarding the Plans, as described herein, are deceptive acts or practices in the conduct of the business trade or commerce of insurance and in the furnishing of insurance services.

111. The deceptive acts or practices and the furnishing of insurance services took place in this State because Gerber operates in this State, created and published its deceptive advertisements in this state, and because the insurance transaction took place in this state when Gerber accepted Ms. Loguidice's application for insurance and her premium payments in this state. Moreover, Ms. Norman purchased her policies in this State, where she lives. In short, the underlying nature of the deceptive transactions occurred in New York, and in Ms. Norman's case, all

relevant events occurred in New York.

112. N.Y. Gen. Bus. Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions."

113. Plaintiffs and the class have been injured by Gerber Life's violations of N.Y. Gen. Bus. Law § 349.

114. Gerber Life's misleading and deceptive conduct occurred, and continues to occur, in the course of Gerber Life's business.

115. As an actual and proximate result of Defendant's misconduct, Plaintiffs and the Class were injured and suffered damages.

116. Gerber Life is liable to Plaintiffs and the Class for damages in amounts to be proven at trial.

**SECOND CLAIM FOR RELIEF**

**False Advertising – N.Y. Gen. Bus. Law § 350**

**Asserted on Behalf of the Class**

117. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

118. N.Y. Gen. Bus. Law § 350 provides that "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this

state is hereby declared unlawful."

119. Gerber Life's actions regarding the Plans, as described herein, constitute false advertising in the conduct of the business trade or commerce of insurance and in the furnishing of insurance services.

120. Gerber's false advertising and the furnishing of insurance service took place in this State because Gerber operates in this State, created and published its deceptive advertisements in this state, and because the insurance transaction took place in this state when Gerber accepted Ms. Loguidice's application for insurance and her premium payments in this state. Moreover, Ms. Norman purchased her policies in New York, where she lives. In short, the underlying nature of the deceptive transactions occurred in New York, and in Ms. Norman's case, all relevant events occurred in New York.

121. Plaintiffs and the class have been injured by Gerber Life's violations of N.Y. Gen. Bus. Law § 350.

122. Gerber Life's false advertising occurred, and continues to occur, in the course of Gerber Life's business.

123. As an actual and proximate result of Defendant's misconduct, Plaintiffs and the Class were injured and suffered damages.

124. Gerber Life is liable to Plaintiffs and the Class for damages in amounts to be proven at trial.

## THIRD CLAIM FOR RELIEF

**Fraud in the Inducement**

**Asserted on Behalf of the Class**

125. Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

126. Gerber Life's marketing and representation of the Plans constitutes fraud in the inducement. Under New York law, the elements of a claim of fraud in the inducement are "a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury" *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 578–79, 106 N.E.3d 1176, 1182 (2018)

127. Gerber Life made material misrepresentations regarding the attributes and benefits of the Plans which were false.

128. Gerber Life made these representations knowing them to be false or with recklessness regarding their accuracy.

129. Gerber Life made these representations intending that consumers be induced to purchase the Plans.

130. Plaintiffs and the proposed class justifiably relied upon these

representations when purchasing the Plans.

131. As an actual and proximate result of Defendant's misconduct, Plaintiffs and the Class were injured and suffered damages.

132. Gerber Life is liable to Plaintiffs and the Class for damages in amounts to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of themselves and the Class seek judgment in an amount to be determined at trial, as follows:

(a) For an order enjoining Defendant from continuing the unlawful practices set forth above;

(b) For declaratory and injunctive relief as set forth above;

(c) For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(d) For compensatory damages according to proof;

(e) For statutory damages permitted by GBL §§ 349 and 350;

(f) For reasonable attorneys' fees and costs of suit;

(g) For pre-judgment interest; and

(h) Awarding such other and further relief as this Court deems just, proper and equitable.

**JURY DEMAND**

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: August 23, 2020

/s/ James J. Bilsborrow
James J. Bilsborrow
**Weitz & Luxenberg, P.C.**
700 Broadway
New York, New York 10003
Tel: (212) 558-5500
*jbilsborrow@weitzlux.com*

Lynn A. Toops
Cohen & Malad, LLP
One Indiana Square
Suite 1400
Indianapolis, IN 46204
(317) 636-6481
Fax: (317) 636-2593
*ltoops@cohenandmalad.com*

*Attorneys for Plaintiffs and the Putative Class*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Second Amended Complaint was filed on August 23, 2020 using the Court's ECF electronic filing system and that all counsel of record therefore will receive service via that system.

/s/ James J. Bilsborrow